# Exhibit A

## AFFIDAVIT OF DAVID X. O'NEILL

I, David X. O'Neill, do hereby depose and state that:

1. I am a Special Agent with the United States Drug Enforcement Administration ("DEA"), and have been employed in that capacity for approximately 22 years. I am currently assigned to the Logan Airport Task Force ("LATF"), based at Logan International Airport in East Boston, Massachusetts. The LATF is comprised of police officers from the Massachusetts State Police ("MSP"), and special agents from the DEA. The mission of the LATF is to prevent the flow and transport of illegal narcotics and bulk United States currency related to the sale of narcotics, using the resources of the participating law enforcement agencies. Since the LATF was established, kilograms of controlled substances and millions of dollars of drug proceeds have been seized. Numerous drug traffickers have been convicted and millions of dollars of assets have been successfully forfeited as drug proceeds.

2. Through prior investigations and training, I have become familiar with the methods, language, and terms that are used to disguise the source and nature of illegal narcotics activities. I have conducted or assisted in a number of narcotics investigations. I have testified in criminal trials, in both federal and state courts, as a result of my involvement in those investigations. I have also applied for, been issued, and have executed search warrants in furtherance of narcotics investigations.

3. I submit this affidavit in support of a Verified Complaint for Forfeiture *in Rem* against the following asset:

   a. $49,400 in United States currency, seized from Robert Kenny, at Logan International Airport in Boston, Massachusetts on May 1, 2018 (the "Currency").

4. This affidavit does not contain all the information known to me and other law enforcement officers regarding this investigation, but only those facts sufficient to establish probable cause for forfeiture of the Currency.

5. This affidavit is based upon my personal knowledge, as well as information provided to me by law enforcement personnel from the MSP and the LATF, and my review of records and reports relating to the investigation.

6. As set forth below, I have probable cause to believe that the Currency is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6) because it represents moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, proceeds traceable to such an exchange, and/or moneys, negotiable instruments, and securities used or intended to be used to facilitate such a violation.

**The Seizure of the Currency**

7. On Tuesday, May 1, 2018 at approximately 4:00 p.m., MSP Trooper John Banik, was advised that an individual arrived at the Transportation Security Administration ("TSA") checkpoint in Terminal B with a large amount of United States currency in his carry-on bag. The individual was identified by a North Carolina driver's license as Robert N. KENNY. KENNY was scheduled to fly on United Airlines flight 558 to San Francisco, California. The flight was scheduled to depart Boston at 8:40 p.m.

8. The Currency was discovered in KENNY's backpack during a routine TSA passenger screening. The Currency was packaged in several separate bundles bound by elastic bands. The odor of fresh unburnt marijuana was also present on the Currency. Based on my training and experience, the packaging and smell of the Currency is consistent with proceeds

from the illegal sale of narcotics. KENNY stated that he believed the total amount of currency was $49,600.

10. Trooper Banik and another LATF member, Detective Lt. Thomas Coffey ("DLt. Coffey"), arrived at the TSA checkpoint and spoke to KENNY in an interview room adjacent to the checkpoint. They told KENNY that he was not under arrest and was free to leave. The investigators informed KENNY that they wanted to question him about the currency found in his carry-on bag and his business while in Massachusetts. KENNY acknowledged that he understood and voluntarily remained in the room to speak with the investigators.

11. KENNY stated that he conducts business with companies in Massachusetts and that he had traveled to Boston to collect payment for services provided. He identified himself as the Chief Executive Officer for Royal Supply, a company based in San Francisco. He provided a business card indicating the same, which did not contain a business address. He stated that Royal Supply is a product packaging and marketing company focusing on food and other items. He stated that it has fourteen employees with an office location at 160 Clement St., San Francisco, California and a warehouse located 8026 Lorraine St #2, Stockton, California.

12. KENNY said that he flew from San Francisco and arrived in Boston at 5:40 a.m. that morning, on the same day as he was returning to San Francisco. KENNY stated that he stayed at Boston Logan airport for a couple of hours before leaving to meet his business contacts in Massachusetts. When asked where he traveled to meet his business contacts, after an extended pause, KENNY said that he believed that he went to Bellingham, Massachusetts after requesting a ride from Uber on his cellular telephone. The investigators asked KENNY if he could look up the address on the Uber application on his cell phone. KENNY hesitated and

would not describe the location or business to which he traveled other than to say he visited a Walmart and a McDonald's.

13. KENNY stated that he met a male named "Chris" but would not provide further details about him.[1] Although KENNY claimed Royal Supply provided packaging to Chris's company, KENNY could not provide a name for Chris's company or describe the type of business it was. KENNY then stated, "I'm not sure if he [Chris] even has a company." KENNY explained that he used his cell phone to communicate with Chris to set up the meeting and that he met Chris in a parking lot.

14. KENNY said that he was traveling with cash because his business uses Chase bank as a banking facility and there were no Chase bank branches in Massachusetts where the money could be deposited. When asked why a legitimate business would pay for services in a large amount of cash, mostly twenty dollar bills, wrapped in rubber bands, KENNY attempted to change the subject. When asked why a company paid him in cash for his business services (1,950 twenty dollar bills and 208 fifty dollar bills) and not by check or electronic payment, KENNY shook his head and did not provide an answer.

15. KENNY was unable to provide any documentation for this parking lot transaction. When asked specifically what type of packaging KENNY's company provided to "Chris's" company, he again shook his head and did not answer. DLt. Coffey asked KENNY what type of packaging his company produced, and KENNY responded "paper and plastic." When asked if he could show any photos from his phone as examples of the packaging his company produces, KENNY picked up his phone, looked at it, and then answered that he was unable.

---

[1] *See also*, infra, ¶ 20.

4

16. While the investigators were speaking with KENNY, I conducted a search of KENNY's business website. The company's web site, www.RoyalSupplyWholesale.com, posted the motto, "We've got what you need, except for the weed." The company's website advertised that it specializes in packaging for marijuana and related items. The "Primary Customer Service" telephone number was 1-888-PACK-420. Through my training and experience, I understand that 420 is a numerical reference often used by the marijuana culture. I informed the interviewing investigators of my findings. The investigators asked KENNY why he did not mention that his business facilitated the marijuana trade when he was being asked about his company. KENNY again shook his head. When the investigators asked, KENNY did not provide more specifics about his business, such as who his biggest customers were or the identities of any other business affiliates.

17. Based on the story KENNY provided, the appearance of the currency as packaged, the odor of marijuana emanating from the currency, the fact that KENNY works in a marijuana-related industry, and his travel from a source area of marijuana after admitting that he was only in Massachusetts for one day where he conducted a transaction in a parking lot with an unknown male, the investigators determined that the bulk cash would be detained for further inspection by a narcotics detecting canine. Law enforcement told KENNY that the cash would be transported to MSP Logan barracks for further investigation. Law enforcement offered KENNY the opportunity to go to the barracks to obtain a receipt for the Currency. KENNY declined and said he would continue with his travel to San Francisco. The interview was terminated.

18. DLt. Coffey and Trooper Banik returned to the barracks with the Currency. Trooper Christopher Coscia also responded to the barracks with his K-9, Felix. Trooper Coscia

has been employed by the MSP for 18 years and has been assigned to the K-9 Unit since July of 2005. Felix is a six year-old German Shepherd. In 2014, Trooper Coscia and Felix attended and successfully completed a 320 hour course in narcotic detection through the New England State Police Administrator's Conference ("NESPAC"). Felix is certified to detect marijuana, cocaine, heroin, and methamphetamine. Trooper Coscia and Felix attend recertification on a yearly basis. Their most recent recertification was completed on April 20, 2017. Since the initial NESPAC accreditation course, Trooper Coscia and Felix have maintained their training at a minimum of 16 hours per month. Searches conducted by Felix have led to the seizure of marijuana, cocaine, heroin, and methamphetamine. Trooper Coscia advises that Felix is a well-trained and reliable K-9.

19. Trooper Coscia and Felix went to an office where the Currency was secreted without Trooper Coscia's knowledge. Under the supervision of Trooper Coscia, Felix scanned the room and alerted to a drawer where the Currency was hidden, indicating the presence of narcotics odor. After the K-9 scan and alert, the Currency was counted. The Currency totaled $49,400 and comprised of 208 $50 bills and 1950 $20 bills. Law enforcement secured the money at the barracks and later deposited it into the Troop F Seized Assets Account.

20. **Identification of "Chris":**[2] At Boston Logan Airport, KENNY provided Trooper Banik his (KENNY's) telephone number (cell). Later, I requested information on calls made to and from that telephone number from Verizon Wireless via a DEA subpoena. An analysis of those calls revealed that on May 1, 2018, and dates leading up to the cash seizure at Boston Logan Airport, KENNY was in contact with a telephone number subscribed to by a person with the fist name "Chris." The subscriber's address is listed as located in Franklin,

---

[2] The complete identity of this person is known to me but his last name is omitted.

6

Massachusetts. Franklin is a neighboring town of Bellingham, where KENNY stated that he allegedly met a "Chris." The Chris listed as the subscriber in Franklin is known to the DEA as a suspected marijuana trafficker. More specifically, on or about August 14, 2009, in Middleboro, Massachusetts, the DEA seized approximately $84,000 from Chris, who stated during the seizure that he was traveling to meet another individual with the intention of purchasing pound quantities of marijuana. Based on my training and experience, $84,000 of marijuana is a trafficking, not user, quantity. On November 24, 2009, the DEA administratively forfeited the $84,000.

21. Further analysis of KENNY's telephone calls revealed that also on May 1, 2018, and the days leading up to the Currency seizure, KENNY's telephone number was in contact with a number subscribed to by a person who resides in Bellingham and who had been arrested on multiple charges involving the cultivation and possession to distribute marijuana.[3]

22. Further research into KENNY's Royal Supply business revealed that the company's website lists an address of 237 Kearny St., Suite 231, San Francisco, CA. An open source internet search revealed that 237 Kearny St. is the address of Union Post SF, a mailbox rental location. Suite 231 is a rented mailbox and not a physical location for the business. KENNY gave the investigators a business office location of 160 Clement St., San Francisco. An open source search and an Accurint database search of public records for the Clement St. address yielded no results.

23. During the investigation, I obtained and reviewed financial records for a Royal Supply bank account at JP Morgan Chase. These records showed that, from the period of December 8, 2017 to April 18, 2018, Royal Supply made 29 cash deposits totaling $159,852.

---

[3] The complete identity of this person is known to me but his name is omitted.

7

The cash deposits were unusual because Royal Supply does not appear to have a store front where cash transactions might occur.

24. Based on my training and experience, I believe that the Currency is traceable to an exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, and/or moneys used or intended to be used to facilitate any such violation and should be forfeited based upon the following;

    a) A drug detection canine alerted to the presence of a narcotic odor on the cash;

    b) The odor of fresh marijuana was also readily apparent to Trooper Banik and DLt. Coffey;

    c) KENNY admitted that he was only in Massachusetts for a few hours. He traveled from San Francisco, California and returned to San Francisco on the same day to collect payment for services provided;

    d) KENNY's business, Royal Supply, caters to the marijuana trade, which KENNY did not disclose to the investigators;

    e) KENNY, the business's Chief Executive Officer, stated that he conducted a business transaction in an unknown parking lot with an unidentified man, who paid cash for products that KENNY could not describe;

    f) Generally, KENNY was unable to provide plausible answers to simple questions. He was nervous and uninformed about his business and his alleged business transaction;

    g) KENNY's business's web site lists the "Primary Customer Service" telephone number as 1-888-PACK-420. 420 is a numerical reference often used by the marijuana culture;

    h) From the period of December 8, 2017 to April 18, 2018, Royal Supply made 29 cash deposits totaling $159,852.00. This volume of cash transactions is inconsistent with a business like Royal Supply that does not appear to have a store front; and

    i) KENNY's telephone was in contact with a minimum of two suspected illegal marijuana traffickers, including one who had drug proceeds forfeited previously, who live and operate in the Bellingham area on the same day he was in Massachusetts.

## Conclusion

25. Based upon the information set forth above, probable cause exists to believe that the Currency is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881 (a)(6) because it represents proceeds traceable to an exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, and/or moneys used or intended to be used to facilitate any such violation.

Signed under the penalty and pains of perjury this 25th day of October, 2018.

David X. O'Neill
Special Agent
Drug Enforcement Administration

LESLIE A. MCCARTHY
Notary Public
Commonwealth of Massachusetts
My Commission Expires
October 8, 2021